IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NEIL JOHNSON and CHERYL JOHNSON, | |
| Plaintiffs, | MEMORANDUM DECISION AND ORDER |
| vs. | |
| HENRY VOGT MACHINE CO., et al., | Case No. 2:06-CV-00622DAK |
| Defendants. | Judge Dale A. Kimball |

This matter is before the court on Defendants[1] Motion for Summary Judgment. The court held a hearing on the motion on January 30, 2008. At the hearing, Stephen Russell and Jordan Kendell represented Plaintiffs Neil and Cheryl Johnson, and Douglas Owens, Eric Schnibbe, and Timothy Conde represented Defendants. Following the hearing, the court took the matter under advisement. Now, having carefully considered the memoranda and additional materials submitted by the parties, as well as the relevant law and facts relating to the motion, the court renders the following Memorandum Decision and Order.

---

[1] Named Defendants are Henry Vogt Machine Co.; Science Applications International Corporation; Washington Group International, Inc.; Parsons Infrastructure & Technology Group, Inc.; Battelle Memorial Institute; Circle Seal Controls, Inc., Continental Research and Engineering, LLC; and Selas Fluid Processing Corp.

1

**BACKGROUND**

Since 1994, Plaintiff Neil Johnson (Johnson) has worked for EG&G Defense Materials, Inc. (EG&G), located south of Tooele, Utah, at the Tooele Chemical Agent Disposal Facility (the Disposal Facility).  EG&G contracts with the United States government to operate the Disposal Facility and dispose of the U.S. Army's stockpile of chemical weapons.

On July 15, 2002, Johnson and a fellow employee, Matt Glavin, were performing maintenance work on one of the furnaces at the Disposal Facility when sarin, a known toxic chemical agent, was released into the air where Johnson and Glavin were working (the Incident).  Following the Incident, both Glavin and Johnson underwent a decontamination process that involved scrubbing with soap and bleach.  Glavin was immediately informed that he had been exposed to sarin.  Johnson believed at the time, and has continued to believe, that he also was exposed to sarin.

**Medical Ailments Following The Incident**

Beginning the day of the Incident, Johnson experienced anxiety and serious depression.  Johnson attributed the depression and anxiety to the trauma of the Incident and the decontamination process.  Johnson also testified that immediately after the Incident he suffered from insomnia and that he attributed his insomnia, like the depression and anxiety, to the trauma of the Incident and the decontamination process.  At the time of his insomnia, Johnson told his wife, Cheryl Johnson (C.J.), that he could not stop thinking about the Incident.

A few days after the Incident, Johnson developed a cough.  C.J. informed him that she thought that his cough might have been caused by the decontamination procedure following the

Incident.

On September 2, 2002, Johnson suffered a heart attack. Johnson believed at the time that the Incident caused the heart attack. A month after the heart attack, Johnson discussed the attack with a paramedic at EG&G's medical clinic. The paramedic indicated that he thought the Incident contributed to the heart attack.

In early October 2002, Johnson met with Dr. Stephen McCurdy, an organophosphate specialist at the University of California, Davis, who told Johnson that sarin exposure did not contribute to his heart attack. Specifically, Dr. McCurdy stated that Johnson's exposure was minimal and unlikely to have caused his heart attack or to lead to any long-term health consequences. Johnson did not believe or accept Dr. McCurdy's opinion and suggested that Dr. Gary Matravers, a doctor from the EG&G clinic, who also told Johnson that he had not been exposed to sarin, had "set up" Dr. McCurdy to opine that Johnson had not been affected by sarin.

Approximately six months after the Incident, Johnson consulted Dr. Lucia Altamirano, a neurologist, to determine if his difficulties with memory loss and concentration were related to the Incident. Dr. Altamirano referred Johnson to Dr. James Snyder, a neuropsychologist. Johnson met with Dr. Snyder in September 2003, and Dr. Snyder diagnosed Johnson with short-term memory loss. Neither Dr. Altamirano or Dr. Snyder had experience with sarin and could not answer Johnson's questions about whether the sarin exposure caused the memory loss.

Dr. Altamirano's records, dated March 10, 2004, document her assessment that Johnson suffered from "Nerve Gas Toxicity." Dr. Altamirano ordered a functional MRI, a neuroradiology test, "for memory and concentration problems due to nerve gas exposure in an accident." She referred Johnson to Dr. Wendall Gibby to perform the MRI.

In March 2004, Johnson received a copy of the MRI report.  The MRI report, dated March 24, 2004, stated:  "History:  Memory and concentration problems following nerve gas exposure. . . .  Impression:  Abnormal functional evaluation of the brain for short-term and long-term memory functioning."

Around this same time, Johnson also received a copy of Dr. Snyder's report.  The report provided:  "Diagnosis:  1.  Mild encephalopathy  2.  Cognitive Disorder NOS  3.  Mild Adjustment Disorder  4.  History of Sarin Exposure  5.  Past History of a Concussion."  The report also stated that

> findings suggest mild cognitive disfunction, especially with regard to visual processing and visual memory.  Although the clinical effects of acute [s]arin exposure have been reported in detail, research on the long-term cognitive effects is still in its infancy.  Early studies of low-level clinically asymptomatic [s]arin exposure with non-human populations suggest some impairment in visual memory and visuo-spatial brain systems that were present and measurable up to 12-18 months later.  A three-year follow-up study of . . . rescue team staff and police officers involved in the Tokyo subway [s]arin attack suggested the possibility of subtle, chronic decline in visual memory function up to three and half years later possibly due to down regulation of the cholinergic system of the brain. . . .  While some researchers have made some tentative conclusions about long-term effects of [s]arin, other studies have been mixed or inconclusive.  In the case of [Johnson], a past history of what appears to be a closed head injury, sustained during a rodeo accident, presents some confounding variables.  Further clinical evidence, like a [functional] MRI, is needed to better help understand the basis of this patient's current cognitive impairment.

Johnson testified that he understood Drs. Altamarino's, Gibby's, and Snyder's evaluations to only indicate that he suffered from short-term memory loss.  According to Johnson, none of the physicians rendered an opinion as to possible sarin exposure or informed him that he was suffering from nerve agent toxicity.  Johnson requested, but did not receive, Dr.

Altamirano's records prior to filing this action. Johnson did not discuss his functional MRI results with Drs. Altamirano or Gibby. Johnson did not discuss Dr. Snyder's report with anyone with medical or scientific training. He claims to have no understanding of the information included in Dr. Snyder's report and testified that Dr. Snyder did not verbally inform him that he suffered from brain injury, cognitive disfunction, or a mild adjustment disorder.

In 2004, Johnson developed shortness of breath. In 2005, Johnson learned, after consulting with his attending physician and a lung specialist, that his right diaphragm suffered from paralysis. Although Johnson directly asked both his attending physician and the pulmonologist about whether sarin exposure caused or contributed to his paralysis, neither doctor could render an opinion. Johnson, nevertheless, continued to believe that sarin exposure caused both the shortness of breath and the diaphragm paralysis. Johnson also believed that the sarin exposure caused the weakness in his arms that he began experiencing sometime between late 2003 and early 2005.

Since 2002, Johnson has consistently maintained that his insomnia, anxiety, heart attack, memory loss, cough, shortness of breath, physical weakness, and paralyzed diaphragm are all the result of sarin exposure caused by the Incident. C.J. confirmed that Johnson has attributed these ailments to the Incident and has never deviated from that belief.

Over the last four years, EG&G has paid all the expenses incurred by Johnson in visiting with various healthcare providers. EG&G has not dissuaded Johnson from seeking medical advice or from seeing certain providers. Johnson testified that he "felt free to investigate [his] ailments as [he] saw fit."

**Legal Actions Following the Incident**

Approximately six months after the Incident, Johnson consulted with attorney Mick Harrison, who represents Johnson in another matter. On June 25, 2003, Harrison sent a letter to EG&G and its legal counsel on behalf of Johnson, threatening litigation as result of the Incident. The letter stated that Johnson and Glavin "were involved in a chemical incident at [the Disposal Facility] on July 25, 2002. Both were exposed to chemical warfare agent . . . [s]arin in the [I]ncident." Johnson knew of the letter and its content, including its reference to studies suggesting that low level exposure to sarin can have detrimental health effects.

Glavin went on to sue the U.S. Army and various contractors. Johnson has followed developments in Glavin's lawsuit since the time of filing.

About two years after the Incident, Johnson consulted another attorney, Terry Plant, who did not take any action because of a lack of knowledge and experience with sarin.

In 2005, Johnson contacted his current attorneys, who were also representing Glavin, to determine whether Johnson might have a claim. The attorneys urged Johnson to seek evaluation by Dr. Kaye Kilburn. Johnson did not see Dr. Kilburn until July 5, 2006, approximately two months after the attorneys urged Johnson to seek evaluation. Dr. Kilburn evaluated Johnson in California. He concluded that, in his opinion, Johnson's "exposure to sarin on July 15, 2002, and other possible exposures to toxic agents in the course of employment at EG&G, was the proximate cause of health and other problems including, without limitation, memory loss, pulmonary dysfunction, persistent coughs, colds, flu[,] pneumonia[,] and physical weakness." Johnson received Dr. Kilburn's written report on July 12, 2006.

**Present Lawsuit**

Plaintiffs filed the present lawsuit against Defendants on July 27, 2006.  In their Amended Complaint, Plaintiffs allege strict product liability, strict liability for unreasonably dangerous activity, negligence, breach of express warranties, breach of implied warranties, and loss of consortium.[2]  When asked about the delay in bringing suit, Johnson exclaimed that he "was having a hard time [getting] someone to represent [him]."

On October 23, 2007, Defendants moved for summary judgment, asserting that the statutes of limitations applicable to Plaintiffs' claims have all expired.

**DISCUSSION**

In their Amended Complaint, Plaintiffs allege multiple causes of action against Defendants:  negligence, strict product liability, strict liability for unreasonably dangerous activity, breach of express warranties, breach of implied warranties, and loss of consortium. Pursuant to Federal Rule of Civil Procedure 56(c), Defendants move for summary judgment as to all Plaintiffs' claims, contending the relevant statutes of limitations have expired.  *See* Fed. R. Civ. P. 56(c). Defendants contend that Plaintiffs' causes of action began to accrue on the day of the Incident, July 15, 2002, because Johnson believed he had been exposed to sarin at the time of the Incident and testified that he continuously suspected that his subsequent ailments, from

---

[2]  In their Amended Complaint, Plaintiffs also allege punitive damages as an independent cause of action—and Defendants appear to acknowledge it as such, attributing a specific statute of limitations to the punitive damages claim.  But, as noted by the Utah Supreme Court in *Norman v. Arnold*, 2002 UT 81, 57 P.3d 997, "punitive damages cannot be pleaded as an independent cause of action."  *Id*. at ¶8 n.2.  "As a remedy, it must be requested in conjunction with a cognizable cause of action."  *Id*.

depression to diaphragm paralysis, were caused by sarin exposure. Plaintiffs contend that summary judgment is inappropriate because the discovery rule tolled the relevant statutes of limitation until July 2006.

Under rule 56(c), "[s]ummary judgment is appropriate if the record shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *True v. United States*, 190 F.3d 1165, 1171 (10th Cir. 1999) (quoting Fed. R. Civ. P. 56(c)). In reviewing a motion for summary judgment, the court "view[s] the factual record and draw[s] any reasonable inferences therefrom in the light most favorable to the nonmoving party." *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

Utah law dictates the relevant statutes of limitations governing Plaintiffs' claims. *See Burnham v. Humphrey Hospitality Reit Trust, Inc.*, 403 F.3d 709, 712 (10th Cir. 2005) ("A federal court sitting in diversity applies state law for statute of limitations purposes."); *see also Dow Chem. Corp. v. Weevil-Cide Co., Inc.*, 897 F.2d 481, 483-84 (10th Cir. 1990) ("A federal court hearing a diversity action applies the statute of limitations which would be applied by a court of the forum state."). Under Utah law, a four year statute of limitations applies to negligence claims and claims of strict liability for unreasonably dangerous activity. *See* Utah Code Ann. § 78-12-25(3) (2002). A four year statute of limitations also governs claims for breaches of warranty in personal injury actions. *See Davidson Lumber Sales v. Bonneville Inv., Inc.*, 794 P.2d 11, 16 (Utah 1990) (holding that warranty "[a]ctions for personal injury damages or tortious injury to personal property are governed by general, non-U.C.C. limitations periods"); Utah Code Ann. § 78-12-25(3). Utah statute establishes a two year statute of limitations for strict product liability claims. S*ee* Utah Code Ann. § 78-15-3 (2002). The governing statute of

limitations for a spouse's loss of consortium clam is that "applicable to the injured person." Utah Code Ann. § 30-2-11 (Supp. 2007).[3]

Utah law also "determines when . . . [Plaintiffs'] action is commenced for statute of limitations purposes." *Burnham*, 403 F.3d at 712. Under Utah law, "[a]s a general rule, a statute of limitations begins to run 'upon the happening of the last event necessary to complete the cause of action.'" *Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶20, 108 P.3d 741 (quoting *Myers v. McDonald,* 635 P.2d 84, 86 (Utah 1981)). "Once a statute has begun to run, a plaintiff must file his or her claim before the limitations period expires or the claim will be barred." *Id*. "Mere ignorance of the existence of a cause of action will neither prevent the running of the statute of limitations nor excuse a plaintiff's failure to file a claim within the relevant statutory period." *Id*.

The discovery rule, however, is a recognized exception to this general rule, tolling the statute of limitations period "until the discovery of facts forming the basis for the cause of action." *Id*. at ¶21 (additional quotations and citations omitted). "There are two types of discovery rules: a 'statutory discovery rule' and an 'equitable discovery rule.'" *Moore v. Smith*, 2007 UT App 101, ¶26, 158 P.3d 562 (quoting *Russell*, 2005 UT 14 at ¶¶21, 24). "A statutory discovery rule is one that is included within the governing statute, and an equitable discovery rule applies when a statute does not include a statutory discovery rule." *Id*.

Under the statutory discovery rule,

---

[3] Because a decision as to whether Plaintiffs' loss of consortium claim is time barred rests upon the court's determination of whether the statutes of limitations have run on Plaintiffs' other claims, the loss of consortium claim is not discussed separately in the proceeding analysis. But any decision as to these other claims effectively impacts and equally applies to the loss of consortium claim.

> [o]nce the triggering event identified by the statutory discovery
> rule occurs--i.e., when a plaintiff first has actual or constructive
> knowledge of the relevant facts forming the basis of the cause of
> action--the statutory limitations period begins to run and a plaintiff
> who desires to file a claim must do so within the time specified in
> the statute. Otherwise, the claim will be barred.

*Russell*, 2005 UT 14 at ¶22.  The equitable discovery rule only applies if there is no applicable statutory discovery rule, and

> may operate to toll an otherwise fixed statute of limitations period
> to the following two situations:  (1) "where a plaintiff does not
> become aware of the cause of action because of the defendant's
> concealment or misleading conduct," and (2) "where the case
> presents exceptional circumstances and the application of the
> general rule would be irrational or unjust, regardless of any
> showing that the defendant has prevented the discovery of the
> cause of action."

*Id.* at ¶25 (additional quotations and citation omitted).

The court first determines that the statutory discovery rule applies to Plaintiffs' strict product liability claim.  Under Utah Code section 78-15-3, a products liability action must "be brought within two years from the time the . . . claimant . . . discovered, or in the exercise of due diligence should have discovered, both the harm and its cause."   Utah Code Ann. § 78-15-3. The Utah Supreme Court has noted that "determining when a plaintiff either discovered or reasonably should have discovered his or her cause of action is often a difficult and intensely fact-dependent inquiry."  *Russell*, 2005 UT 14 at ¶22; *see also Aragon v. Clover Club Foods Co.*, 857 P.2d 250, 253 (Utah Ct. App. 1993) ("Due diligence is a highly fact-sensitive determination.").

Here, the record shows that Johnson knew that Gavin suffered from sarin exposure; that six months after the Incident, an attorney sent a letter to EG&G, on behalf of Johnson and Gavin,

alleging exposure to sarin; that Johnson knew Gavin filed suit and followed developments in Gavin's suit; that the EG&G paramedic indicated sarin exposure as a possible cause of Johnson's 2002 heart attack; and that Johnson received Dr. Snyder's report in March 2004, noting the possible role of sarin exposure in Johnson's visual memory function.

But the record also shows that Dr. McCurdy told Johnson that he had not suffered from sarin exposure; that Johnson did not receive Dr. Altamarino's report diagnosing Johnson as suffering from nerve gas toxicity until after the filing of the instant action; that Johnson pursued opportunities to consult with various medical practitioners about various ailments he suffered from and whether those ailments were caused by sarin exposure; that studies as to long-term health consequences of sarin exposure may be mixed and inconclusive; and that several doctors that evaluated Johnson's ailments could not render opinions as to whether sarin exposure was a contributing factor.

It is well established that the court's role on summary judgment is not to weigh evidence or credibility.  *See Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989).  Because, in light of the above evidence, any determination as to when Plaintiffs discovered or in the exercise of due diligence should have discovered the harm and its cause would require the court to engage in such an improper evaluation, the court denies Defendants' Motion for Summary Judgment as to Plaintiffs' strict product liability claim.

The court next determines that Plaintiffs' remaining claims of negligence, breaches of express and implied warranties, and strict liability for unreasonably dangerous activity are not subject to statutory discovery rules, and the court evaluates their possible tolling under the equitable discovery rule.  As noted, fraudulent concealment and exceptional circumstances are

two instances that justify tolling under the equitable discover rule. *See Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶25, 108 P.3d 741.

"Under the fraudulent concealment doctrine, Utah courts toll the running of the limitations period if a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct." *Colosimo v. Roman Catholic Bishop*, 2007 UT 25, ¶38, 156 P.3d 806 (additional quotations and citation omitted). "[B]efore a plaintiff may rely on the fraudulent concealment doctrine, he must have actually made an attempt to investigate his claim and . . . such an attempt must have been rendered futile as a result of the defendant's fraudulent or misleading conduct." *Id*. at ¶40. Here, Plaintiffs assert that the equitable discovery rule applies because EG&G misled Johnson as to the potential cause of his injuries by telling him that he was not exposed to sarin. But, it does not appear that EG&G is a named defendant in this action, and Plaintiffs do not allege that any of the named Defendants provided misleading information. Furthermore, even if EG&G is a named defendant, the undisputed facts reveal that Johnson's attempt to investigate his claim was not rendered futile by EG&G's fraudulent or misleading conduct. Johnson testified that the medical personnel at EG&G, who told him he was not exposed to sarin, did not dissuade him from his belief that he suffered from exposure; that despite EG&G's statements, Johnson continued to seek the opinions of independent healthcare providers as to possible sarin exposure; and that EG&G allowed and paid for these independent medical evaluations.

As for the exceptional circumstances doctrine, the court "appl[ies] a two-step analysis." *Macris v. Sculptured Software, Inc.*, 2001 UT 43, ¶18, 24 P.3d 984. First, the plaintiff must show that he "did not know of and could not reasonably have known of the existence of the

cause of action in time to file a claim within the limitation period." *Id*. (quotations and citation omitted). "If [the plaintiff] meets this threshold showing, a balancing test is applied to determine whether there are exceptional circumstances that render the application of a statute of limitations irrational or unjust." *Id*.

Relying on the same record evidence as set forth by the court in its statutory discovery rule analysis, the court concludes that a genuine issue of material fact exists as to when Plaintiffs knew or could have reasonably known that their causes of action existed.[4] The court therefore denies Defendants' Motion for Summary Judgment as to Plaintiffs' claims of negligence, strict liability for unreasonably dangerous activity, and breaches of expressed and implied warranties.

## CONCLUSION

Defendants' Motion for Summary Judgment is DENIED.

DATED this 5th day of February, 2008.

BY THE COURT:

*[signature: Dale A. Kimball]*

DALE A. KIMBALL

United States District Judge

---

[4] Because Plaintiffs must demonstrate as a threshold issue that they did not know of or could not have known of the existence of their causes of action in time to file within the limitations period, the court does not address the second prong of the exceptional circumstances analysis. *See Macris v. Sculptured Software, Inc.*, 2001 UT 43, ¶18, 24 P.3d 984.